The Baldwin Brothers Company v. Commissioner.
Baldwin Bros. Co. v. Commissioner
Docket No. 4404.
United States Tax Court
1945 Tax Ct. Memo LEXIS 109; 4 T.C.M. (CCH) 796; T.C.M. (RIA) 45262; July 30, 1945
Walter H. Scott, Esq., for the petitioner. Cecil H. Haas, Esq., and Lawrence R. Bloomenthal, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding is for the redetermination of deficiencies in income tax, declared value excess profits tax and excess profits tax for the fiscal year ended February 28, 1941, in the respective amounts of $13,208.13, $7,364.58, and $7,407.73. The questions in issue are (1) whether the petitioner is entitled to deduct from gross income a worthless debt in the amount of $45,766.09 and (2) whether the petitioner is entitled to deduct for officers' salaries $88,200 in lieu of $13,200, the amount of the officers' salaries actually paid during the fiscal year. Findings of Fact The petitioner is an Ohio corporation *110 which was organized on February 17, 1916. Its principal office is in Cleveland. It filed its tax returns for the fiscal year here involved with the collector of internal revenue at Cleveland. It is engaged in the business of grading, paving and building highways and bridges, and general construction. Most of its business during the taxable year was done in the Commonwealth of Pennsylvania. In its income tax return for the taxable year the petitioner deducted from gross income $45,766.09 as a debt owed to it by the Clifton Building Co., which became worthless in the taxable year. This deduction was disallowed by the respondent. The Clifton Building Co. was formed in 1923 by Baldwin, Nelson, Ewing, Johnson and Myers. The first four were stockholders in the petitioner company. The company was a building corporation formed principally to buy and sell lots and to build and sell houses. The original capital of the company was $30,000, which was divided equally among the five incorporators, each of whom subscribed to 100 shares of stock. All paid their subscriptions in cash except Myers, who gave his note for $6,000. Clifton Building Co. bought the land from the petitioner, which had *111 received it for work done, and built 18 or 20 houses. After it had built and sold a few houses Clifton Building Co. took real estate as part payment on several trades and, as a result, ran out of cash. Petitioner advanced cash to it from 1923 until 1926 amounting to $75,000, which was repaid. Commencing in 1927 the real estate business became bad and, as a result, petitioner advanced money to Clifton which was used for making principal and interest payments on mortgages for paying taxes. Clifton discontinued the building of houses and other business activities in 1932. In that year it sustained a loss of several hundred dollars due to the closing of Guardian Trust Co., in Cleveland. Thereafter the company had no cash and the petitioner advanced $25 to it each year for the payment of its corporate franchise tax. With that exception no further advances were made by petitioner to Clifton after February, 1933, which at that time totalled about $45,000. It was impossible for the petitioner to carry on any further as to Clifton because petitioner had been caught in the closing of the banks and had lost money on construction jobs. The following is the balance sheet of the Clifton Building *112 Co. as of December 31, 1932, which is the last balance sheet prepared for it: ASSETS
Cash
$ 374.15
Investments: Stock, Midwest Savings & Loan
$ 100.00
Stock, Lakewood Savings & Loan
100.00
200.00
Real Estate: Strongsville Acreage - Cost
$69,301.35(a)
Cliff Drive - Sublot #29
21,931.65(b)
Lakeview Road - Sublots 6, 7, 8, 9
12,997.30(c)
Woodlawn Avenue - Sublot #15
3,983.91(d)
West 227th Street - Lot #4
1,671.43(e)
109,885.64
Deferred: J. B. Myers - Special Account
6,989.40
TOTAL ASSETS
$117,449.19
LIABILITIES AND NET WORTH
Accounts Payable - The Baldwin Bros.
$ 43,786.72
Mortgages Payable: General
$15,500.00
Strongsville Acreage (Elsie M. Friend)
8,300.00(a)
Cliff Drive (Guardian Trust Co.)
4,092.21(b)
Lakeview
3,400.00(c)
31,292.21
Net Worth: Capital Stock
$30,000.00
Surplus: Balance, Jan. 1, 1932
$13,912.04
Less: Loss for year 1932
1,541.78
42,370.26
Balance Dec. 31, 1932
$12,370.26
TOTAL LIABILITIES and NET WORTH
$117,449.19
The Strongsville Acreage which cost $69,301.35, shown on the balance sheet as item (a), had a mortgage on it of $8,300 payable to *113 Elsie M. Friend. This mortgage was foreclosed and judgment was obtained against Clifton on November 2, 1934, in the amount of $18,118.87 with interest from October 17, 1934. The property was sold to plaintiff for $13,334, and the sale was confirmed and deed issued on December 31, 1934. The deficiency on the judgment of over $4,784 has never been paid. Sublot No. 29, Cliff Drive, shown on the balance sheet as item (b) as an asset of $21,931.65, was mortgaged to the Guardian Trust Co. to secure payment of $4,092.21. Upon foreclosure suit the Guardian Trust Co. on March 16, 1938, secured judgment against Clifton for $979.60 with interest, representing tax payments advanced by the plaintiff, and for $5,580.96 plus interest, representing the balance due on the mortgage note. The property was sold for $4,334 and the sale was confirmed and deed issued on May 16, 1938. The deficiency on the judgment of over $2,226 has remained unpaid. Sublots Nos. 6, 7, 8 and 9, Lakeview Road, shown on the balance sheet as item (c) as an asset of $12,997.30 was mortgaged to the Cleveland Trust Co. to secure payment of $3,400. Upon foreclosure suit the Cleveland Trust Co. secured judgment against Clifton *114 on January 29, 1937, for $3,400 with interest from December 15, 1932. The property was sold for $3,200 and the sale was confirmed and deed issued on April 26, 1937. The deficiency on the judgment of over $200 has never been paid. The petitioner had junior mortgages on all of the properties above described on which it realized nothing due to the foreclosure of the first mortgages. Petitioner had a first mortgage on sublot No. 15, Woodland Avenue, shown as item (d) on the balance sheet as an asset of $3,983.91, and on lot No. 4, West 227th Street, shown as item (e) on the balance sheet as an asset of $1,671.43, to secure payment of Clifton's indebtedness totalling more than $45,000 owed petitioner. Taxes on the Woodland Avenue property in 1940 amounted to $909.87, which included delinquencies from former years amounting to $740.50 and special taxes payable for 1940 and prior years amounting to over $100. Taxes on the West 227th Street property in 1940 amounted to $365.64, which included delinquencies from former years amounting to $310.67 and special taxes for 1940 and prior years amounting to more than $40. All of these taxes were unpaid and were liens on the property. The delinquent *115 taxes were many times what the lots could have been sold for. There was an increasing real estate market with respect to the property located in the section of those two lots from 1934 to 1940. These properties were offered for sale but the petitioner received no bids for them. Petitioner foreclosed its mortgages on these two pieces of property in March, 1943, at which time it secured a judgment against Clifton for $89,188.32 and interest from March 5, 1943. These properties were sold on March 31, 1943, subject to delinquent taxes for $100 each. The purchase price of $200 was used to pay court costs of $103.76 and the balance of $96.24 was applied on fees for the services rendered by petitioner's attorney. The petitioner realized nothing from the foreclosure and sale of these properties. A producing gas well was drilled in the vicinity of these properties late in 1920 or early in 1930 but no developments resulted in any demand for the two lots owned by Clifton and upon which the petitioner had first mortgages. J. B. Myers, architect and general manager for Clifton, who had given his note as a subscriber to 100 shares of the stock of Clifton Building Co., never paid any part of *116 the principal on the note. At December 31, 1932, he was indebted to Clifton in the amount of $6,989.40. This debt was worthless in 1933. Clifton owned two shares of stock of $100 each of savings and loan stock which were subject to attachment upon executions under the judgments which had been obtained against Clifton. These two shares of stock were sold in 1940 for $200 and the proceeds turned over to the petitioner, which credited the amount against the indebtedness owed to it by Clifton. At a meeting held on December 10, 1940, petitioner's board of directors adopted the following resolution: "On motion duly made and seconded it was unanimously agreed that the account of The Clifton Building Company should be charged off during this fiscal year due to the fact that the real estate still owned by said company would never be able to reduce its indebtedness to this company. However, it was agreed that the said company's account be given credit for its equity in two shares of Savings and Loan Stock which it still holds." The debt of Clifton to the petitioner was charged off as worthless during the taxable year in the amount of $45,766.09. The indebtedness of Clifton to the *117 petitioner in the amount of $45,766.09 did not become worthless during the taxable year ended February 28, 1941. Petitioner began business as a partnership about 60 years ago but after the death of one of the Baldwin brothers in 1916 the partnership was succeeded by the petitioner corporation. Nelson, Ewing and Johnson had a small interest in the business in 1916 and in 1926 bought the controlling interest. The stockholders of the petitioner in the taxable year and the number of shares of stock held by each were as follows: Name
Shares
W. E. Baldwin
1
Ralph J. Nelson
300
Fred W. Ewing
119
John W. Johnson
110
A. S. Hopkinson
60
C. B. Jones
10
The president of the petitioner during the taxable year was William B. Baldwin, who had not been active in the business since 1926. Ralph J. Nelson was vice-president and treasurer. He took care of all of the finances, accounts receivable, and accounts payable, did all of the bidding with the help of Ewing, and was general supervisor of all of the work, including asphalt contracts and asphalt plants. He also had charge of a $117,000 paving job on Route 225, Clifford County, Pa. In 1940 the petitioner bid on 22 *118 different projects with a value of between $3,500,000 and $4,000,000. Nelson had been connected with the petitioner company for 36 years. Fred W. Ewing in 1940 was secretary of the petitioner, assisted in the bidding and was general superintendent of a little over $1,000,000 of work. He was superintendent of two jobs, one on the Pennsylvania Turnpike for about $920,000, and one on Route 8 in Butler County, Pa., on a contract of half a million dollars, of which $200,000 was completed during the taxable year. He is a specialist on bridge building, paving of all kinds, grading, heavy construction railroad building, and a general all-around superintendent. He had 20 foremen under him in 1940. He has been with the petitioner company for about 35 years. He worked about 15 hours a day for the petitioner during the taxable year. His headquarters were at Greensburg, Pa.
John W. Johnson was vice-president of petitioner and was superintendent of a Cloverleaf job in the suburbs of Cleveland. He was the superintendent of all of the petitioner's equipment, was an expert concrete man, and was an expert on machinery and equipment. The Cloverleaf job in Cleveland was a very difficult undertaking. *119 Johnson has been with the petitioner company about 35 years and before that was with the Cleveland Trinidad Paving Co. where he was concrete superintendent. The petitioner operated at a net loss during each of the years ended February 28, 1933, to February 29, 1940. The following table contains comparative and statistical data as to sales, salaries, profits, etc., for the fiscal years from 1933 to 1942: 2/28/33
2/28/34
2/28/35
2/29/36
2/28/37
1. Gross sales
$373,634
$334,026
$362,287
$ 329,449
$ 662,234
2. Officers' salaries
34,650
2,400
22,300
18,300
78,000
3. Net Loss (Adjusted)
24,663
23,490
15,491
16,973
17,022
4. Salaries cancelled
63,560
5. Dividends paid
4,600
8,900
6. Salaries paid
11,550
2,400
6,300
9,300
16,500
2/28/38
2/28/39
2/29/40
2/28/41
2/28/42
1. Gross sales
$510,590
$926,182
$737,706.00
$1,615,229.00
$1,692,380
2. Officers' salaries
50,600
27,750
27,900.00
88,200.00
28,200
3. Net loss (Adjusted)
16,339
13,416
13,452.95
44,914.67
26,839
4. Salaries cancelled
55,500
68,000.00
7,000
5. Dividends paid
2,380.00
4,800.00
3,020
6. Salaries paid
12,600
12,750
12,900
13,200.00
19,200
*120 Each of the officers, Nelson, Ewing and Johnson, were paid the same amount during each of the taxable years 1934 to 1942, inclusive. The $11,550 paid as officers' salaries in 1933 was all paid to Nelson. In its returns for the above-mentioned years the petitioner claimed no deduction for depreciation upon its machinery and equipment. The respondent determined that it was entitled to a deduction for depreciation for those years in the amount of $131,810.40. The net loss shown above for each year was after the deduction of allowable depreciation agreed to by the parties. The net loss adjusted for the taxable year (ended February 28, 1941), of $44,914.67; was after the deduction of a worthless debt owed to it by the Clifton Building Co. in the amount of $45,766.09 and after the deduction of $88,200 for officers' salaries, of which amount the respondent disallowed the deduction of $75,000 in the determination of the deficiency. The respondent determined that the taxable net income for the fiscal year was $93,768.64 from which he deducted allowable depreciation in the amount of $17,917.22 and a net loss brought forward from the preceding fiscal year ended February 29, 1940, of $13,452.95, *121 making the net income as adjusted $62,398.47. At a directors' meeting held on March 6, 1940, at which Nelson, Ewing, Johnson and Hopkinson were present as directors, the following resolution was adopted: "Upon motion duly made, seconded and approved, the salaries of the Officers for the year 1940 and/or until business conditions warrant and further action by this Board were continued as being at the discretion of the Treasurer and General Manager and depending upon the financial condition of the company's treasury. However, in view of the small salaries received in the past ten years, and anticipating better profits on jobs now under construction and in prospect, the Treasurer is hereby authorized to pay additional salaries for this fiscal year not to exceed $25,000.00 each to R. J. Nelson, F. W. Ewing, and J. W. Johnson. This is in accordance with resolution adopted by the Board of Directors, March 7, 1921." The basic salary of $4,400 for each of the officers Nelson, Ewing and Johnson was continued. Those are the salaries that were paid to these individuals during the taxable year. At the time the resolution was adopted the directors were of the opinion that the business for *122 the taxable year would show a profit which would enable the corporation to pay compensation to each of the officers of $29,400 for the year. That was the amount which was accrued upon the books of account and deducted in the income tax return. By reason of adverse factors the petitioner was not able to pay to its three officers during the fiscal years ended February 28, 1933, to February 29, 1940, inclusive, what it regarded as reasonable salaries for them. What were regarded as reasonable salaries were deducted in the income tax returns for some of the years but not for others. The same condition obtained in the years prior to 1933 and in that year the officers gratuitously cancelled $63,560 of their salaries. In the fiscal year ended February 28, 1937, salaries accrued to the officers were in the amount of $78,000; but $55,500 of that amount was not paid. This unpaid balance was gratuitously cancelled by the officers in the fiscal year ended February 28, 1939. The excess salaries accrued over the amounts paid during the fiscal years 1938, 1939 and 1940 aggregated $105,000. These salaries were gratuitously cancelled by the officers during the taxable year now before us in the amount *123 of $68,000. For the taxable year the petitioner accrued as salaries due its officers $88,200, or $29,400 for each officer. The respondent has determined that only $13,200 of this amount, the amount of salaries actually paid, is a legal deduction from gross income. Reasonable compensation for services actually rendered by the three officers for the taxable year was $45,000, or $15,000 for each officer. Opinion The first question for decision is whether the petitioner is entitled to deduct from gross income of the taxable year a worthless debt in the amount of $45,766.09 owed to it by the Clifton Building Co. It submits that during the taxable year it received approximately $200 from that company which was credited against the debt; that the company had no assets from which it could make a further recovery; and that the debt was ascertained to be worthless during the fiscal year. It cites many decisions to the effect that the ascertainment of worthlessness must be made by the taxpayer and that where there is a possibility of a recovery of only a small amount of the debt the taxpayer is not required to charge off a part of the debt as worthless. It should be observed, however, that *124 provision for the deduction of bad debts was radically changed by section 124 of the Revenue Act of 1942 and that that amendment was made retroactive with respect to all taxable years beginning after December 31, 1938. The law, as amended, permits the deduction from gross income of "debts which become worthless within the taxable year." The question here is whether the debt of the Clifton Building Co. to the petitioner became worthless in the fiscal year ended February 28, 1941. We think that it did not. The Clifton Building Co. was hopelessly insolvent long prior to the taxable year. If it had any assets, they were subject to execution on deficiency judgments which had been obtained against it by others than the petitioner. The two lots owned by that company upon which the petitioner had a first mortgage were in fact worthless prior to 1940. Petitioner never realized anything from the sale of the lots and it was plain prior to 1940 that it never would. From a realistic standpoint we must hold that the debt was worthless prior to the taxable year; hence, it could not become worthless during the taxable year. The second question relates to the amount of salaries which the petitioner *125 on the accrual basis is permitted to deduct from the gross income for its taxable year for its three principal officers. Section 23 (a) (1) (A) of the Internal Revenue Code permits the deduction from gross income of "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *" The corporation deducted from gross income $88,200 for salaries of these individuals, although it paid them during the taxable year only $13,200, or $4,400 each. The respondent has apparently disallowed the deduction of the additional salaries of $25,000 each upon the ground that the company was not in a position to pay such salaries and that the company had for many years claimed the deduction of larger salaries for its officers than it could pay with the result that at different periods the officers cancelled the unpaid salaries. The respondent has, therefore, determined that the deductible amounts are only the amounts of salaries paid within the fiscal year, namely, $13,200. We think it is undoubtedly true that *126 the services performed by the petitioner's officers were reasonably worth more than the $13,200 paid. It only remains to be considered whether the salaries were accrued in good faith and whether they were reasonable in amount for the services performed. The petitioner has offered the testimony of a number of competent witnesses to the effect that the services performed by these officers were reasonably worth from $25,000 to $35,000 per year. It seems plain, however, from the entire record that the petitioner was not in a position during the taxable year to pay the full amount of the $88,200 accrued for officers' salaries. Only $13,200 of the accrued salaries was paid during the taxable year. The stipulated facts are that $6,000 of the salaries accrued during the taxable year was paid on November 5, 1941, and a like amount on August 25, 1942, February 29, 1944, and February 28, 1945, and the accrued salaries for the fiscal year ended February 28, 1942, were in the amount of $28,200. The evidence indicates that these three officers devoted their entire time and attention to the business of the petitioner during the taxable year and that all worked long hours. From a consideration of *127 the entire record we conclude that reasonable salaries for the officers for the taxable year aggregated $45,000, or $15,000 each. Decision will be entered under Rule 50.